UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Lynn M. Perry,
      Claimant

                                    Case No. 19-cv-522-SM
      v.                            Opinion No. 2020 DNH 014

Andrew Saul, Commissioner,
Social Security Administration,
      Defendant

**O R D E R**

Pursuant to 42 U.S.C. § 405(g), claimant, Lynn Perry, moves
to reverse the Commissioner's decision denying her application
for Disability Insurance Benefits under Title II of the Social
Security Act (the "Act"), 42 U.S.C. § 423, and Supplemental
Security Income Benefits under Title XVI of the Act, 42 U.S.C.
§§ 1381-1383(c).  The Commissioner objects and moves for an
order affirming the decision.

For the reasons discussed below, claimant's motion is
denied, and the Commissioner's motion is granted.

**Background**

I.    **Factual Background**

A detailed factual background can be found in the
claimant's statement of facts (document no. 9), and the
Commissioner's statement of facts (document no. 11).  A brief

summary is provided, with an emphasis on the history of Perry's physical impairments, because her appeal of the ALJ's decision is focused thereon.

Perry was born in 1972. Prior to July, 2015, she worked as a bartender, a banquet waitress, and a waitress. In her application for benefits, Perry stated that her ability to work is limited by the following physical or mental conditions: bipolar disorder, attention deficit disorder; "hip problems;" and "disc problems" and arthritis in her back. Admin. Rec. at 271. In Perry's Function Report, she reported she was unable to work because she could not "stand, sit or walk for more than 10 minutes at a time." Admin. Rec. at 280. She further noted that she had some difficulties getting dressed, bathing, and shaving her legs, and found cooking more difficult because she was unable to stand for long periods of time. Id. at 281. Claimant reported that she was able to do her laundry (but needed help to carry the laundry basket), cook, wash dishes and light cleaning, but could not rake, garden, sweep, mop or reach to dust. Id. at 282-283. Claimant further reported that she was able to drive alone; shop for food, clothes and household products; and attend family social gatherings, and weekly church services. Id. at 283-284.

A.   Medical Evidence in the Record

Perry has been treated for her hip pain and lower back pain for the past several years by several different practitioners. Dr. Richard McKenzie has been claimant's primary care physician since at least December, 2014.  Admin. Rec. at 435 et. seq. Claimant frequently visited Dr. McKenzie requesting prescriptive pain relief, which, she reported, allowed her to maintain function.  See, e.g., admin. rec. at 429 (Aug. 31, 2015, office visit); R. at 426 (Oct. 23, 2015, office visit); R. at 422 (Feb. 11, 2016, office visit).  For example, at an office visit on March 24, 2017, claimant reported that she continued to "have some intermittent breakthrough symptoms," but her "analgesia is helping her to maintain function."  Admin. Rec. at 470. Similarly, at a September 20, 2016, office visit, claimant reported that her "analgesics are working reasonably well, but she does have some breakthrough symptoms."  Admin. Rec. at 473.

On physical examination of claimant's "osteopathic/ musculoskeletal" system, Dr. McKenzie frequently observed: "There is no kyphoscoliosis.  The cervical, thoracic and lumbar curves are normal.  There is full range of motion of all four extremities.  No evidence of cyanosis, clubbing, or edema." See, e.g., id.  (Dec. 23, 2014, office visit).  See also admin. rec. at 422 (Feb. 11, 2016, office visit); 473 (Sept. 20, 2016, office visit); 470 (Mar. 24, 2017, office visit); 567 (Sept. 25,

2017, office visit).  Dr. McKenzie occasionally observed that
claimant had "decreased range of motion in her lumbar spine with
hypertonicity of paraspinal muscles."  See, e.g., admin. rec. at
420 (May 12, 2016, office visit); 426 (Oct. 23, 2015, office
visit).  For her pain, Dr. McKenzie prescribed claimant
Oxycodone and Percocet.  He also referred her to physical
therapy (which, claimant later reported, exacerbated her pain
(admin. rec. at 429)), and to a pain clinic for steroid
injections.  See, e.g., admin. rec. at 567, 422.  Dr. McKenzie's
most recent treatment notes, from late-2017 and early-2018,
report that claimant's back impairment was stable; he did not
recommend changing her treatment regimen.  See admin. rec. at
472, 562, 565, 569.

    Claimant received treatment from Littleton Hospital for her
back pain on two occasions: on July 12, 2015, and on August 28,
2015.  On July 12, 2015, claimant visited the emergency room,
complaining of severe pain, and difficulty walking.  Admin. Rec.
at 355.  She was diagnosed with low back strain.  Id. at 364.
On August 28, 2015, claimant returned to the emergency room,
reporting back and leg pain.  The medical records from that
visit report the following result of a musculoskeletal exam:

> Back was nontender to palpitation over the posterior
> spinous processes of the thoracic spine and the
> paraspinal musculature.  She had no palpable

paraspinal spasm.  Low back was nontender to palpation
over the posterior spinous processes of the lumbar
spine and paraspinal musculature.  No palpable lumbar
spasm.  She moved quite well with exam.

Admin. Rec. at 380.  Those records further state:

[Claimant] has filled 3 prescriptions for narcotics
including March, April and July from 3 different
providers only one of which appears to be her PCP.  I
had a long conversation with the patient stating that
the policy in . . . emergency medicine is that we are
not the prescribers of chronic pain medication and I
referred her to her PCP. . . .  The patient became
somewhat argumentative and began to escalate and she
became quite angry repeatedly requesting narcotic pain
medicine. . . .  She seemed to be ambulating with
minimal difficulty at the time of discharge.

Admin. Rec. at 380.


In the autumn, 2015, claimant treated with orthopedic

surgeon Dr. Dougald MacArthur at the Alpine Clinic for leg pain

and associated weakness, with buckling of the leg.  Admin. Rec.

at 346.  Dr. MacArthur ordered an MRI, which showed "partial

sacralization of the L5 vertebra bilaterally (greater on the

right), severe hypertrophic facet changes at L4-5 (worse on the

right) with borderline to mild spinal canal stenosis and

moderate bilateral foraminal compromise, and mild degenerative

disc disease and bulging disc at L2-3 with borderline to mild

foraminal compromise (worse on the right)."  Cl.'s Statement of

Material Facts at 4 (citing Admin. Rec. at 348-349).  Claimant

was referred to a spine center.

Finally, claimant treated with AVH Surgical Associates'
Pain Management Clinic, for "spinal stenosis, unspecified spinal
region;" and "spondylosis of lumbar region without myelopathy or
radiculopathy." Admin. Rec. at 549. At an office visit on May
19, 2016, claimant reported chronic low back pain, and posterior
and lateral thigh pain. Id. at 550. She further reported that
"her lower extremities give out" with any heavy lifting. Id.
Claimant's physical examination revealed an abnormal gait and
station, as well as tenderness and pain upon examination of the
spine.[1] She was diagnosed with spinal stenosis and spondylosis
of the lumbar region, and, on June 2, 2016, received lumbar
spine injections at L3 through L5. Admin. Rec. 558-559.

_____

[1]    At that visit, APRN Carmen Ackerson noted the following:

       [Claimant] has violated [controlled substance
       agreement] in past . . . and she was weened down due
       to being late for pill count. She was previously
       being seen here and we were unable to reach for pill
       count and DUA. . . . She is NOT a candidate for
       opiates through this clinic. No [controlled substance
       agreement] done and patient refused DUA today. We
       will only treat her with non-narcotic and
       interventional procedures. She was belligerent at
       this [office visit] . . . At her last office visit
       here[,] it was noted "She was very upset and refused
       to leave exam room for several minutes, her
       [significant other] came back into area as well,
       security was notified, arrived, and patient and
       [significant other] left." If this occurs again[,]
       patient will not be seen at this office.

Admin. Rec. at 549.

On October 25, 2016, Dr. Peter Loeser performed an orthopedic consultative examination of claimant. Admin. Rec. 465-68. He noted that, "[o]ther than mild abdominal pain and loss of lumbar lordosis," "there [were] no significant findings on physical examination." Admin. Rec. at 467. He further noted that claimant appeared "comfortable at rest and with activity, and move[d] with ease around the examination room without any apparent . . . impairment." Admin. Rec. at 467-68.

Claimant received another MRI on June 27, 2018, which showed a "transitional lumbrosacral junction; moderate multifactorial L304 spinal stenosis and multifactorial neural encroachment with probable exiting right L3 radicular impingement; a shallow subligamentous mixed spondylitic protrusion at L4-5 with facet arthrosis causing mild bilateral neural foraminal encroachment; hypertrophic facet arthrosis and slight synovial cyst formation at the right L3-4 facet joint; a disc protrusion at L3-4 with annular tear and hypertrophic facet arthrosis; and, thoracolumbar scoliosis and rotation." Cl.'s Statement of Material Facts at 6-7 (citing Admin. Rec. at 591-592).

Finally, the record indicates that claimant was engaging in a variety of physical activities (or at least told her health care providers that she was engaging in those activities). For

example, at a May 12, 2016, office visit, claimant reported that her pain had improved over the winter because she had been "fairly inactive," but, as she increased her activity — she had gone to pick fiddlehead ferns a day prior — her pain had increased.  Admin. Rec. at 420.  Claimant also told her health care providers that she exercised twice a week (admin. rec. at 504), often "would go out in the evening until 3AM or later" (admin. rec. at 451); went camping and swimming (admin. rec. at 522); engaged in "heavy lifting" (admin. rec. at 422); and conducted seemingly strenuous home renovations, including stripping wallpaper, lifting old linoleum, and tearing down plasterboard (admin. rec. at 531, 534).

    B.    Opinion Evidence in the Record

    There are two medical opinions in the record that assess claimant's physical limitations.  The first is from Dr. Jonathan Jaffe, a state agency consultant who did not treat or examine claimant, but reviewed the evidence in the record.  On October 26, 2016, Dr. Jaffe opined that claimant could occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; and stand, walk and sit about six hours in an eight hour work day. Admin. Rec. at 101-102.  He further opined that claimant could occasionally climb ramps, stairs, ladders, ropes and scaffolds;

and could occasionally balance, stoop, kneel, crouch, and crawl.
Admin. Rec. at 101-102.

On December 14, 2017, Dr. McKenzie completed a "Multiple
Impairment Questionnaire," in which he opined that claimant
could sit, stand and/or walk for less than an hour (on a
sustained and ongoing basis).  Admin. Rec. at 489-493.  He
further opined that her pain, fatigue, or other symptoms were
severe enough to frequently interfere with claimant's attention
and concentration, and that claimant would need to take
frequent, unscheduled breaks to rest at unpredictable intervals
during an eight-hour workday.  Id.  Dr. McKenzie stated that
claimant's limitations had been present since before December
23, 2014.

## II.  **Procedural History**

On February 12, 2016, claimant filed applications for
Supplemental Security Income and Disability Insurance Benefits,
respectively.  She alleged that she was disabled and had been
unable to work since July 31, 2015.  Her application was denied
on October 27, 2016, and claimant requested a hearing before an
Administrative Law Judge ("ALJ").

On July 25, 2018, claimant, her attorney, and an impartial
vocational expert appeared before an ALJ, who considered

claimant's application de novo.  On October 4, 2018, the ALJ

issued her written decision, concluding that claimant was not

disabled, as that term is defined in the Act, through the date

of the decision.  Claimant then requested review by the Appeals

Council.  The Appeals Council denied claimant's request for

review, finding no reason to review the ALJ's decision.

Accordingly, the ALJ's denial of claimant's applications for

benefits became the final decision of the Commissioner, subject

to judicial review.  Subsequently, claimant filed a timely

action in this court, asserting that the ALJ's decision is not

supported by substantial evidence.

Claimant then filed a "Motion to Reverse Decision of the

Commissioner" (document no. 7).  In response, the Commissioner

filed a "Motion for an Order Affirming the Decision of the

Commissioner" (document no. 10).  Those motions are pending.

### III. **The ALJ's Findings**

In concluding that claimant was not disabled within the

meaning of the Act, the ALJ properly employed the mandatory

five-step sequential evaluation process described in 20 C.F.R.

§§ 404.1520 and 416.920.  <u>See generally</u> <u>Barnhart v. Thomas</u>, 540

U.S. 20, 24 (2003).  Accordingly, she first determined that

claimant had not been engaged in substantial gainful employment

since her alleged onset of disability, July 31, 2015.  Admin

Rec. at 18.  She next concluded that claimant suffers from the following severe impairments: "degenerative disc disease, spinal stenosis, labral tear of the hip, attention deficit hyperactivity disorder, bipolar disorder, and depression with anxiety."  Id.  The ALJ then determined that claimant's impairments, whether considered alone or in combination, did not meet or medically equal one of the impairments listed in Part 404, Subpart P, Appendix 1 of the regulations.  Id.[2]

Next, the ALJ concluded that claimant retained the residual functional capacity ("RFC") to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except that the claimant is limited to standing and walking up to six hours and sitting up to six hours in an eight hour workday.  The claimant needs to alternate between sitting and standing every thirty minutes, but changes in her position would not take off her task.  She must avoid work requiring the use of ladders, ropes, or scaffolds.  She is limited to occasionally climbing ramps and stairs, balancing, stopping, kneeling, crouching, and crawling.  The claimant must avoid concentrated exposure to dust, fumes, and poorly ventilated areas.  She is capable of simple, routine tasks with occasional minor changes in

---

[2]    With respect to claimant's mental impairments, the ALJ found that Perry had moderate limitations in understanding, remembering, or applying information; moderate limitation in interacting with others; moderate limitation with regard to concentrating, persisting, or maintaining pace; and moderate limitation in adapting or managing oneself.

The ALJ then determined that the "paragraph B" criteria were not satisfied because the claimant's mental limitations did not amount to two "marked" limitations or one "extreme" limitation.  The ALJ further determined that the "paragraph C" criteria were not satisfied.

the work setting.  She is unable to perform work that
involves fast-paced production standards.

Admin. Rec. at 20-21.  In light of those restrictions, and based
on the testimony of the vocational expert, the ALJ concluded
that claimant was not capable of performing her past relevant
work.  Id. at 31.

Finally, the ALJ considered whether there were any jobs in
the national economy that claimant might perform.  Relying on
the testimony of the vocational expert, the ALJ concluded that
"the claimant is capable of making a successful adjustment to
other work that exists in significant numbers in the national
economy."  Id. at 32.  The ALJ then concluded that claimant was
not "disabled," as that term is defined in the Act, through the
date of her decision.

**Standard of Review**

I.   "Substantial Evidence" and Deferential Review

Pursuant to 42 U.S.C. § 405(g), the court is empowered "to
enter, upon the pleadings and transcript of the record, a
judgment affirming, modifying, or reversing the decision of the
Commissioner of Social Security, with or without remanding the
cause for a rehearing."  Factual findings and credibility
determinations made by the Commissioner are conclusive if
supported by substantial evidence.  See 42 U.S.C. §§ 405(g),

1383(c)(3).  See also Ortiz v. Secretary of Health & Human
Services, 955 F.2d 765, 769 (1st Cir. 1991).  Substantial
evidence is "such relevant evidence as a reasonable mind might
accept as adequate to support a conclusion."  Consolidated
Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).  Importantly, it
is something less than a preponderance of the evidence, so the
possibility of drawing two inconsistent conclusions from the
evidence does not prevent an administrative agency's finding
from being supported by substantial evidence.  Consolo v.
Federal Maritime Comm'n., 383 U.S. 607, 620 (1966).  See also
Richardson v. Perales, 402 U.S. 389, 401 (1971).

     This court's review of the ALJ's decision is, therefore,
both limited and deferential.  The court is not empowered to
consider claimant's application de novo, nor may it undertake an
independent assessment of whether she is disabled under the Act.
Rather, the court's inquiry is "limited to determining whether
the ALJ deployed the proper legal standards and found facts upon
the proper quantum of evidence."  Nguyen v. Chater, 172 F.3d 31,
35 (1st Cir. 1999).  Provided the ALJ's findings are properly
supported by substantial evidence, the court must sustain those
findings even when there may also be substantial evidence
supporting the contrary position.  Such is the nature of
judicial review of disability benefit determinations.  See,

e.g., Tsarelka v. Secretary of Health & Human Services, 842 F.2d 529, 535 (1st Cir. 1988); Rodriguez v. Secretary of Health & Human Services, 647 F.2d 218, 222 (1st Cir. 1981).

## II.  The Parties' Respective Burdens

An individual seeking SSI and/or DIB benefits is disabled under the Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  See also 42 U.S.C. § 1382c(a)(3).  The Act places a heavy initial burden on the claimant to establish the existence of a disabling impairment.  See Bowen v. Yuckert, 482 U.S. 137, 146-47 (1987); Santiago v. Secretary of Health & Human Services, 944 F.2d 1, 5 (1st Cir. 1991).  To satisfy that burden, the claimant must prove, by a preponderance of the evidence, that her impairment prevents her from performing her former type of work.  See Gray v. Heckler, 760 F.2d 369, 371 (1st Cir. 1985); Paone v. Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982).  If the claimant demonstrates an inability to perform her previous work, the burden shifts to the Commissioner to show that there are other jobs in the national economy that she can perform, in light of her age, education, and prior work

experience.  See Vazquez v. Secretary of Health & Human
Services, 683 F.2d 1, 2 (1st Cir. 1982).  See also 20 C.F.R.
§§ 404.1512(f) and 416.912(f).

In assessing a disability claim, the Commissioner considers
both objective and subjective factors, including: (1) objective
medical facts; (2) the claimant's subjective claims of pain and
disability, as supported by the testimony of the claimant or
other witnesses; and (3) the claimant's educational background,
age, and work experience.  See, e.g., Avery v. Secretary of
Health & Human Services, 797 F.2d 19, 23 (1st Cir. 1986);
Goodermote v. Secretary of Health & Human Services, 690 F.2d 5,
6 (1st Cir. 1982).  Ultimately, a claimant is disabled only if
her:

> physical or mental impairment or impairments are of
> such severity that [she] is not only unable to do
> [her] previous work but cannot, considering [her] age,
> education, and work experience, engage in any other
> kind of substantial gainful work which exists in the
> national economy, regardless of whether such work
> exists in the immediate area in which [she] lives, or
> whether a specific job vacancy exists for [her], or
> whether [she] would be hired if [she] applied for
> work.

42 U.S.C. § 423(d)(2)(A).  See also 42 U.S.C. § 1382c(a)(3)(B).

With those principles in mind, the court reviews claimant's
motion to reverse and the Commissioner's motion to affirm the
decision.

**Discussion**

In support of her motion to reverse the ALJ's decision, claimant raises the following errors: (1) the ALJ erred in her assessment of the medical opinion evidence, specifically the opinion of Dr. McKenzie; (2) the ALJ erred by failing to properly evaluate claimant's testimony; and (3) the ALJ erred by failing to reconcile conflicts between the testimony of the vocational expert and the Dictionary of Occupational Titles.

I.  The ALJ Properly Evaluated the Medical Opinion Evidence.

Perry first takes issue with the ALJ's treatment of the medical opinion evidence.  More specifically, she argues that the ALJ erred by giving little weight to the opinion of Perry's treating physician, Dr. McKenzie, and instead relied on the opinion of the state agency physician, Dr. Jaffe.

A. Dr. McKenzie's Opinion

The ALJ wrote the following regarding Dr. McKenzie's December, 2017, opinion:

> The Undersigned considered an impairment questionnaire
> completed by Dr. McKenzie in December 2017. . . .  The
> Undersigned grants little weight to this assessment
> because it is not consistent with the objective
> evidence or conservative course of treatment,
> discussed above.  It is also inconsistent with her
> reported activities of daily living, including doing
> some cleaning and home renovation, as well as her work
> activity, [as] she worked as a waitress after
> September, 2014, and demonstrated more than a one-hour
> sedentary capacity.

Admin. Rec. 30-31.

Perry argues that, because Dr. McKenzie is her treating physician, his opinion should have been given controlling weight. Claimant further argues that, contrary to the ALJ's findings, Dr. McKenzie's opinion is well-supported by the objective medical evidence, and is not inconsistent with claimant's activities of daily living.

In discussing the weight that will be ascribed to the opinions of "treating sources," the regulations applicable to claimant's appeal provide that, "Generally, we give more weight to medical opinions from [the claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. § 404.1527(c)(2). See also Social Security Ruling, Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, SSR 96-2p, 1996 WL 374188 (July 2, 1996). Importantly, however, there is no per se rule requiring the ALJ to give greater weight to the opinion of a treating source. To be entitled to controlling weight, a treating source's opinions must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [cannot be] inconsistent

with the other substantial evidence in [the] case record."  20
C.F.R. § 404.1527(c)(2).

Claimant contends that, contrary to the ALJ's determination
that Dr. McKenzie's opinion is unsupported by the objective
medical evidence, the opinion "expressly stated that the
limitations . . . were based on x-rays of the spine and hip and
MRI findings of the spine."  Cl.'s Mem. in Supp. of Mot. to
Reverse at 3 (citing Admin. Rec. at 484, 488).  And, claimant
contends, those findings are correlated by physical examinations
documenting decreased motion in the lumbar spine, with
hypertonicity of the paraspinal muscles.

As the Commissioner points out, claimant's argument
slightly mischaracterizes the record.  In his opinion, Dr.
McKenzie cited to the x-rays and MRI as "findings that support
[his] diagnosis," (spinal stenosis, left hip pain and
degenerative disc disease of the lumbar spine), not as findings
that support the limitations he assessed in his December, 2017,
opinion.  Admin. Rec. at 484 (Question 2b).  And, as the
Commissioner further notes, a significant percentage of the
findings in the medical record following physical examination of
the claimant — particularly those findings made by Dr. McKenzie

— were normal.[3]  <u>See</u>, <u>e.g</u>, Admin. Rec. at 420-21, 424, 427, 471,
474, 562, 565, 569; <u>see also</u> Admin. Rec. at 346, 381, 467-68.

The claimant's additional arguments regarding the weight
the ALJ afforded Dr. McKenzie's opinion are unpersuasive.
Claimant takes issue with the ALJ's finding that Perry's
activities of daily living were not consistent with Dr.
McKenzie's opinion.  The court agrees, however, with the ALJ:
the record regarding claimant's activities (<u>e.g.</u>, tearing down
plasterboard, lifting old linoleum, stripping wallpaper) is not
consistent with the limitations Dr. McKenzie described in his
opinion.  <u>See</u>, <u>e.g.</u>, Admin. Rec. at 419, 423, 451, 522, 531,
534.

But, claimant continues, there is no evidence that she
engaged in those activities for a prolonged period.  That
argument is similarly unavailing.  As the ALJ pointed out, Dr.
McKenzie noted in his opinion that claimant's limitations had
existed since "before 12/23/2014."  Admin. Rec. 488 (Question

---

[3]     For example, at claimant's office visit on December
14, 2017, (the date on which Dr. McKenzie's opinion was
rendered), claimant informed Dr. McKenzie that "her back pain
and hip pain prevent her from doing any lifting, standing or
sitting for extended periods."  Admin. Rec. at 564.  But, the
"Review of Systems" from the visit states: "Back pain/problems
<u>none</u>.  Joint pain <u>none</u>.  Joint swelling <u>none</u>.  Muscle weakness
<u>none</u>."  <u>Id</u>. at 565 (emphases added).

14a-b).  Claimant continued to work as a bartender/waitress for several months after December 23, 2014, at least until July 2015, work which required "a lot of bending and standing." Admin. Rec. at 429.  Performing that sort of work on a regular basis would, of course, be considered prolonged.  See also Admin. Rec. at 380 (claimant stating that she had been "travel[ling] about town for several hours . . . running some errands").  Moreover, the ALJ did not find that claimant was capable of employment based entirely on her activities. Instead, the ALJ determined that claimant's activities were not consistent with the limitations assessed by Dr. McKenzie.  See 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole [including activities of daily living], the more weight [an ALJ] will give to that medical opinion.").

The ALJ thoroughly explained his reasons for discounting Dr. McKenzie's opinion.  Those reasons are well-supported by the record.  Thus, claimant's criticisms of the ALJ's treatment of Dr. McKenzie's opinion do not warrant remand.

B.   Dr. Jaffe's Opinion

Claimant takes issue with the ALJ's reliance on the opinion
of Dr. Jaffe because, she says, Dr. Jaffe reviewed claimant's
file on October 26, 2016, when it included treatment notes only
through October, 2015.  Therefore, she says, Dr. Jaffe reviewed
only three months of treatment notes, notes that ended three
years prior to the date of the ALJ's decision.

The Commissioner responds that claimant is incorrect: Dr.
Jaffe, in fact reviewed more recent records, including an
October 25, 2016, consultative exam.  See Admin. Rec. at 102-3.
Moreover, the Commissioner says, plaintiff fails to establish
that the medical evidence post-dating Dr. Jaffe's review
demonstrated a sustained worsening in her condition.

"It can indeed be reversible error for an administrative
law judge to rely on an RFC opinion of a non-examining
consultant when the consultant has not examined the full medical
record."  Ferland v. Astrue, No. 11-CV-123-SM, 2011 WL 5199989,
at *4 (D.N.H. Oct. 31, 2011) (quoting Strout v. Astrue, Civil
No. 08-181-B-W, 2009 WL 214576, at *8 (D. Me. Jan. 28, 2009))
(further citations omitted).  However, as the court has
previously stated:

an ALJ may rely on such an opinion where the medical
evidence postdating the reviewer's assessment does not
establish any greater limitations, see <u>Strout v.</u>
<u>Astrue</u> at *8-9, or where the medical reports of
claimant's treating providers are arguably consistent
with, or at least not "clearly inconsistent" with, the
reviewer's assessment.  <u>See</u> <u>Torres v. Comm'r of Social</u>
<u>Security</u>, Civil No. 04-2309, 2005 WL 2148321, at *1
(D.P.R. Sept. 6, 2005) (upholding ALJ's reliance on
RFC assessment of non-examining reviewer where medical
records of treating providers were not "in stark
disaccord" with the RFC assessment).  <u>See also</u>
<u>McCuller v. Barnhart</u>, No. 02-30771, 2003 WL 21954208,
at *4 n.5 (5th Cir. 2003) (holding ALJ did not err in
relying on non-examining source's opinion that was
based on an incomplete record where he independently
considered medical records dated after the non-
examining source's report).

<u>Ferland</u>, 2011 WL 5199989, at *4.


In her decision, the ALJ acknowledged that there was

additional medical evidence in the records following Dr. Jaffe's

review, but concluded "there was no significant decline or

change in the physical or mental impairments, including reported

symptoms, objective findings or course of treatment, as

discussed above."  Admin. Rec. at 30.  Substantial evidence

supports that conclusion.  The ALJ's review of the medical

evidence in her decision includes a thorough discussion of

claimant's medical treatment post-dating Dr. Jaffe's review

which support her finding that that claimant's symptoms remained

generally stable, and that claimant's treatment was unchanged.

<u>See, e.g.</u>, Admin. Rec. at 25-29; <u>see also</u> Admin. Rec. at 472,

562, 565, 569.  Accordingly, claimant's argument that the ALJ
erred in relying on Dr. Jaffe's opinion is unpersuasive.

In sum, for all the above reasons, the ALJ did not err in
her treatment of the medical opinion evidence.

II.  <u>The ALJ Properly Evaluated Claimant's Testimony.</u>

Claimant next argues that the ALJ's evaluation of Perry's
subjective statements is not supported by substantial evidence.
More specifically, claimant finds fault with the ALJ's findings
regarding claimant's activities of daily living and her course
of treatment.

With respect to claimant's argument concerning her
activities of daily living, that argument is substantially
similar to claimant's argument concerning the ALJ's findings
with respect to Dr. McKenzie's opinion.  In her Function Report,
claimant reported that she was unable to "stand, sit or walk for
more than 10 minutes at a time."  Admin. Rec. at 280.  But, as
noted, there is, at a minimum, evidence in the record that
claimant went camping (admin. rec. at 522), performed
substantial home renovations (admin. rec. at 531, 534); went out
all night until three in the morning (admin. rec. at 451), and
exercised twice a week for thirty minutes (admin. rec. at 494,
504).  Performance of such activities is not consistent with the

ability to stand or sit for only ten minutes at a time. See

Bourinot v. Colvin, 95 F. Supp. 3d 161, 182 (D. Mass. 2015) ("It

is not unreasonable to infer that Plaintiff's capacity to engage

in these recreational activities [including going to the beach,

and playing pool and darts] is inconsistent with her testimony

that she can only walk a couple blocks, stand for only 10-15

minutes, and lift only five pounds.") See also Blackette v.

Colvin, 52 F. Supp. 3d 101, 121 (D. Mass. 2014) ("While

Blackette is correct that such activities cannot, by themselves,

demonstrate an ability to work, they can be used — as the

hearing officer used them here — for credibility

determinations.") (citing cases). And, claimant has not argued

— nor does the record support a finding — that her pain was

intermittent in nature, such that she could occasionally

participate in such physical activities, but was other times

largely incapacitated. Based on the court's review of the

record, there is substantial evidence supporting the ALJ's

findings concerning the claimant's ADLs.

The claimant further assigns error to the ALJ's findings

concerning the course of her treatment for her impairment, and

claimant's response to that treatment. However, the ALJ's

findings are well-supported by both the record, and the relevant

case law. See, e.g., Admin. Rec. at 400-01, 421, 424, 427, 430-

31, 472, 550, 560 - 569; see also Anderson v. Berryhill, 368 F. Supp. 3d 128, 130-31, 135 (D. Mass. 2019) (characterizing claimant's treatment with pain medications and physical therapy as conservative, and affirming ALJ's decision to discount medical opinion on that basis).

Substantial evidence supports the ALJ's evaluation of the claimant's testimony.

III. The Vocational Expert's Testimony Does Not Conflict With the Dictionary of Occupational Titles.

Claimant's final argument is that the ALJ erred by failing to reconcile conflicts between the testimony of the vocational expert and the description of the jobs found for claimant in the Dictionary of Occupational Titles ("DOT"). Pl.'s Mem. in Support of Mot. to Reverse at 9.

The vocational expert testified that claimant could perform the following jobs: laundry classifier, price marker, and mailroom clerk. But, says claimant, she could not perform those jobs with the mental limitations found by the ALJ in her RFC, because those jobs require "Level 2" reasoning, according to the DOT's job descriptions.

As the Commissioner points out, the court has previously held that there is no conflict between a limitation to simple,

routine work, and reasoning Level 2 jobs.  See Hebert v. Colvin,
No. 13-CV-102-SM, 2014 WL 3867776, at *6 (D.N.H. Aug. 6, 2014)
("This court joins the majority of district and circuit courts
in holding that an RFC limiting a claimant to jobs involving
'simple instructions' does not, standing alone, eliminate
positions identified in the DOT as requiring 'Level 2'
reasoning.") (citing cases).  Accordingly, there is no conflict,
and claimant's final argument is unpersuasive.


## Conclusion

    This court's review of the ALJ's decision is both limited
and deferential.  The court is not empowered to consider
claimant's application de novo, nor may it undertake an
independent assessment of whether she is disabled under the Act.
Rather, the court's inquiry is "limited to determining whether
the ALJ deployed the proper legal standards and found facts upon
the proper quantum of evidence."  Nguyen v. Chater, 172 F.3d 31,
35 (1st Cir. 1999).  Provided the ALJ's findings are properly
supported by substantial evidence — as they are in this case —
the court must sustain those findings even when there may also
be substantial evidence supporting the contrary position.  Such
is the nature of judicial review of disability benefit
determinations.  See, e.g., Tsarelka v. Secretary of Health &
Human Services, 842 F.2d 529, 535 (1st Cir. 1988) ("[W]e must

uphold the [Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."); <u>Rodriguez v. Secretary of Health & Human Services</u>, 647 F.2d 218, 222 (1st Cir. 1981) ("We must uphold the [Commissioner's] findings in this case if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.").

Having carefully reviewed the administrative record and the arguments advanced by both the Commissioner and claimant, the court necessarily concludes that there is substantial evidence in the record to support the ALJ's determination that claimant was not "disabled," as that term is used in the Act, at any time prior to the date of her decision.

For the foregoing reasons, as well as those set forth in the Commissioner's legal memorandum, claimant's motion to reverse the decision of the Commissioner (document no. 7) is denied, and the Commissioner's motion to affirm her decision (document no. 10) is granted. The Clerk of the Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

January 28, 2020

cc:  Daniel S. Jones, Esq.
     Brenda M. Golden Hallisey, Esq.
     Luis A. Pere, Esq.